UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

DERRICK S. WILKERSON,                      Civil No. 07-249 RHK/FLN

                    Plaintiff,

v.                                         **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.

_____

Daniel S. Rethmeier, for Plaintiff.
Lonnie F. Bryan, Assistant United States Attorney, for the Government.

_____

Plaintiff Derrick Wilkerson seeks judicial review of the final decision of the Commissioner

of Social Security ("Commissioner"), who denied his application for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.  *See* 42 U.S.C.

§ 1382 (c).  This Court has jurisdiction over the claim pursuant to 42 U.S.C. § 405 (g).  This matter

was referred to the undersigned United States Magistrate Judge for Report and Recommendation

pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  The parties have submitted cross-motions for

summary judgment [#14 and #18].  For the reasons set forth below, it is the Court's recommendation

that Plaintiff's motion [#14] be denied, Defendant's motion [#18] be granted and the Commissioner's

decision be affirmed.

## I.  INTRODUCTION

Plaintiff filed applications for DIB and SSI on October 29, 2002, alleging that he became

unable to work because of his disabling condition on May 1, 2001.  (Tr. 63-65, 323-325.)  The

1

Social Security Administration denied the application initially (Tr. 32-34), and on reconsideration. (Tr. 35-37.)   Plaintiff timely filed a request for a hearing (Tr. 47), which was held before Administrative Law Judge ("ALJ") Roger Thomas (Tr. 15-30, 56-60.)   At the hearing, Plaintiff testified on his own behalf, and was represented by Daniel Rethmeier.  (Tr. 52-53, 354-377.)  Also testifying on his behalf were Renae Peters (his fiancé), Scott Mattson (a former employer), and Jo Mattson (wife of Scott Mattson and mother of Renae Peters).  (Tr. 349, 377-394.)  James Felling, Ph.D., testified as a neutral medical expert ("ME") in the area of psychology (Tr. 55, 349, 392-401), and Wayne Onken, M.S., testified as a vocational expert ("VE").  (Tr. 54, 349, 401-406.)

Following the hearing, the ALJ rendered an unfavorable decision dated November 26, 2004, finding that Plaintiff retained a residual functional capacity ("RFC") that rendered him capable of work that existed in significant numbers in the national economy.  (Tr. 15-30.)  Plaintiff requested a review of the ALJ's decision on December 20, 2004 (Tr. 12-14), which the Appeals Council denied by letter dated December 1, 2006.  (Tr. 7-9.)  The decision of the ALJ thus became the final decision of the Commissioner.

Plaintiff initiated this action in federal court seeking judicial review on January 19, 2007, and moved for summary judgment on June 8, 2007.  He raises three central issues in his motion.  First, he argues that the ALJ failed to evaluate the medical evidence of record properly.  (Pl.'s Mem. 12-16.)  Second, he argues that the ALJ erred by failing to afford credibility to his subjective complaints of pain.  (Pl.'s Mem. 16-19.)  Last, he argues that the ALJ failed to offer the vocational expert a valid and complete hypothetical.  (Pl.'s Mem. 19.)  Defendant filed his motion for summary judgment on July 20, 2007.

## II.  STATEMENT OF FACTS

### A.  Background

Derrick Wilkerson was born on June 15, 1968 (Tr. 63), and was 36 years old at the time of the ALJ's determination.  (Tr. 28.)  At the date that Plaintiff alleges he became unable to work, May 1, 2001, he was employed as a resident assistant at Arlington Place, a senior home.  (Tr. 72, 79, 96, 108.)  However, it is unclear whether he was in fact unable to work, as the record shows he continued to work at Arlington Place through August 2001.  (*Id.*)  Plaintiff contends that his alleged onset date was the last day he worked at the golf course.  (Pl.'s Mem. 4.)  Plaintiff has worked for two golf courses: Blackberry Ridge Golf Course, from August 2001, through October 2001 (Tr. 72, 108), and Stone Creek Golf Course.  (Tr. 108.)  But the record shows that his employment at the latter was terminated in October 1998.  (Tr. 378.)  None of these dates correspond to the onset date that Plaintiff claims he became unable to work.

Since his alleged onset date, Plaintiff has worked in golf course maintenance (Tr. 72, 108), road construction (Tr. 72, 79), and machine cleaning.  (Tr. 356-57.)  Plaintiff also has past experience that includes car-washing, dishwashing, and roofing.  (Tr. 70-72, 79, 368, 377-78.)  He has completed high school through the tenth grade, and attended special education classes during that time.  (Tr. 84.)

### B.  Medical Evidence - Physical Impairments

Prior to his alleged onset date, Plaintiff presented for treatment of pain in his right shoulder, right knee, and right foot.  In June 1999, Plaintiff complained of difficulty bending and applying pressure to his knee.  (Tr. 183.)  He was diagnosed with hamstring pain, and advised to treat with ice, ibuprofen, and stretching.  (*Id.*)  Less than two months later, he presented with pain in the right

3

foot.  (Tr. 181.)  He was diagnosed with mildly flat feet, referred for an orthotic, and released to work without restrictions.  (*Id.*)

In October 2000, Plaintiff presented for continued pain in his right shoulder, which he had injured in January of the previous year. (Tr. 166-67.)  He tested positive for an impingement, which was treated with a cortisone injection.  (*Id.*)  Within five minutes following the injection, the patient had nearly complete pain control.  (Tr. 167.)  He was scheduled for a follow-up in two weeks, at which time the pain in his shoulder would be rechecked.  (*Id.*)  Plaintiff did not show for his follow-up appointment.  (Tr. 164.)

On July 15, 2002, Plaintiff was involved in an automobile accident.  (Tr. 148.)  As a result, he suffered a nondisplaced fracture of the medial malleolus at the right ankle.  (*Id.*)  Plaintiff also complained of pain in his mid to lower thoracic back.  (*Id.*)  The examination yielded no bruising of the back, but found some tenderness to the lower thoracic spine.  (*Id.*)  An X-ray of the thoracic spine appeared normal.  (*Id.*)

On July 17, 2002, Plaintiff visited Ky Dang, M.D., for a check of the injuries sustained in his automobile accident.  (Tr. 143.)  Plaintiff complained of more pain in his right knee, left lower leg, and lower back.  (*Id.*)  Dr. Dang reported that Plaintiff had no swelling in his back, but mild to moderate tenderness in the lumbar spine area.  (*Id.*)  The right knee showed mild swelling and moderate tenderness on the lateral aspect of the knee, as well as a slightly decreased range of motion on flexion.  (*Id.*)  There was mild tenderness in his left lower leg, and his left knee was within normal limits except for minimal tenderness in the medial aspect.  (Tr. 144.)  X-rays of the lumbar spine, right knee, and  left lower leg were all negative.  (*Id.*)  Plaintiff was referred to orthopedics, which he saw the same day.  (*Id.*)

An evaluation by Joel Shobe, M.D., at St. Cloud Orthopedic Associates found moderate swelling and tenderness over the medial aspect of the right ankle. (Tr. 235.) Plaintiff was nontender laterally. (*Id.*) Overall alignment of the ankle was good, and distal sensation and motor function of the foot were normal. (*Id.*) Dr. Shobe found a trace effusion to the right knee, but none on the left. (*Id.*) Plaintiff was diagnosed with a nondisplaced medial malleolar fracture in the right ankle and a right knee sprain, and placed in a short-leg, non weight bearing cast. (Tr. 234-35.)

On August 1, 2002, Plaintiff presented for a follow up appointment for his ankle fracture and knee sprain. (Tr. 234.) Plaintiff stated that his right knee had improved significantly, but he had experienced some discomfort to his right ankle. (*Id.*) Plaintiff's cast had loosened due to a decrease in swelling, so a new cast was applied. (*Id.*) X-rays demonstrated the fracture to be in good position, and Plaintiff was ordered to remain nonweightbearing, with crutches, for another three to four weeks. (*Id.*) Plaintiff was also given a work note at this time. (Tr. 233-34.)

On August 22, 2002, approximately six weeks out from his accident, Plaintiff returned to St. Cloud Orthopedic Assocaites. (Tr. 233.) He stated that he had been doing "quite well" and that "his pain has become very minimal over the last few weeks." (*Id.*) The cast was removed, and new X-rays were taken. (*Id.*) These demonstrated callus formation, and the fractures appeared to be in good alignment. (*Id.*) Dr. Shobe advised the Plaintiff to begin transition from crutches to weight bearing with a CAM walker. (*Id.*) A work slip was also given, allowing Plaintiff to return to work the next day for light duty. (*Id.*)

Plaintiff returned on September 17, 2002, for a nine-week checkup. (*Id.*) He stated that he had  "been doing well," aside from some occasional ankle soreness which was managed with Tylenol or Ibuprofen. (*Id.*) The right ankle was nontender along the medial malleolus, and Plaintiff

had been working on his range-of-motion exercises.  (Tr. 232.)  Another set of X-rays were taken, which demonstrated good alignment of the fracture and adequate callus formation.  (*Id.*)  Dr. Shobe referred Plaintiff for physical therapy for range of motion and strengthening of the right ankle.  (*Id.*)

On November 11, 2002, Plaintiff presented for a recheck of his fractured ankle.  (*Id.*)  He complained of significant pain in the medial portion of the ankle.  (*Id.*)  Dr. Shobe examined the ankle, and found tenderness along the posterior tibial tendons, and mild but less tenderness over the medial malleolus.  (*Id.*)  He ordered an MRI scan of the ankle, which suggested possible slight to mild tendinopathy involving the posterior tibial tendon at the level of the medial malleolus, although without evidence for tendon rupture, longitudinal splitting**,** or pathologic fluid within its tendon sheath.  (Tr. 231-32).  On November 19, 2002,  Plaintiff returned with similar complaints.  (Tr. 229, 232.)  Dr. Shobe reported that Plaintiff's symptoms suggested posterior tibial tendonitis, ordered Plaintiff to continue using a CAM walker, and provided samples and a prescription for Celebrex.  (Tr. 229.)

Plaintiff began chiropractic treatments with Jerry Wetterling. D.C., on February 11, 2003, for neck and back pain radiating down to his right leg.  (Tr. 209-221.)  On May 7, 2003, an MRI of Plaintiff's lumbar spine was normal.  (Tr. 275-76.)   On May 8, 2003, Dr. Wetterling wrote a letter stating that Plaintiff had been totally disabled due to the injuries sustained in the accident.  (Tr. 209.)  On May 30, 2003, he wrote another letter indicating Plaintiff was limited to lifting 20 pounds.  (Tr. 208.)

On April 14, 2003, Plaintiff presented for a nine-month recheck of his ankle fracture, and complained of pain along both the medial and anterior aspects of the ankle.  (Tr. 228.)  He reported that any type of twisting motion to the ankle seemed to aggravate the pain.  (*Id.*)  Dr. Shobe's

examination indicated mild tenderness to palpation directly over the anterior aspect of the ankle. (*Id.*)  Dr. Shobe was not able to appreciate any effusion, and likewise found no evidence for medial lateral instability.  (*Id.*)  X-rays taken that day demonstrated that the fracture appeared to have healed well with evidence of significant degenerative changes.  (*Id.*)  Plaintiff was referred to a podiatrist for further input on treatment options.  (*Id.*)

Plaintiff presented to Stephen Mariash, D.P.M., a podiatrist, on April 29, 2003.  (Tr. 227.) Dr. Mariash's evaluation found no edema or erythema, no spasticity, and normal muscle strength. (*Id.*)  Dr. Mariash diagnosed Plaintiff with pain, possibly secondary to tibialis posterior tendinosis, and ordered a repeat MRI scan.  (*Id.*)  This MRI scan, taken June 3, 2003, showed healing of the ankle fracture, mild localized degenerative narrowing of the talar dome, very mild, short segment tendinopathy involving the posterior tibialis tendon, a bi-lobed, two centimeter ganglion cyst, and mild generalized thickening involving the anterior talofibular ligament.  (Tr. 225-26.)

On September 7, 2003, Gregory Salmi, M.D., a state medical consultant, reviewed the record and reported that Plaintiff was capable of the following: occasional lifting of 50 pounds, frequent lifting of 20 pounds, standing or walking with normal breaks for about six hours of an eight-hour workday, sitting for six hours of an eight-hour workday, and limited pushing and pulling in the lower extremities.  (Tr. 236-43.)

On September 10, 2003, Plaintiff presented to Dante Beretta, M.D., for pain radiating from the lower back to the right lateral hip area and partially down the right leg.  (Tr. 307.)  Plaintiff claimed the pain was increased with getting out of bed and with generalized activity such as walking.  (*Id.*)  Dr. Beretta noted a recent X-ray showing normal appearing hip joints with possible spurring off the sacroiliac joints, as well as an MRI of the lumbar spine dated July 28, 2003, that

showed mild foraminal narrowing L5-S1 primarily due to facet arthropathy and hypertrophy.  (*Id.*)

Dr. Beretta reported some mild tenderness with palpation in the lower back and good range of

motion, but with some mild pain at full flexion.  (*Id.*)  Plaintiff also had full range of motion in both

hip joints, but had some pain with external rotation of the right hip.  (*Id.*)  Plaintiff was assessed with

chronic low back pain and right hip pain, and advised to continue physical therapy, take Motrin three

times a day when necessary, continue use of heat when necessary, and obtain an orthopedic

consultation. (Tr. 308.)        Plaintiff reported for physical therapy on September 11 and 24, 2003,

but an October 21, 2003, note  indicated that he did not return after his September 24, 2003,

appointment.  (Tr. 291-98.)  On September 24, 2003, Plaintiff also followed up with Dr. Beretta.

(Tr. 308.)  He stated that neither physical therapy or Ibuprofen had been helpful with his back pain,

and that he was once again experiencing pain in his right ankle.  (*Id.*)  Dr. Beretta's examination

showed Plaintiff had a good range of motion in his back, with some mild pain associated with

extension and full flexion of the back.  (*Id.*)  Plaintiff also showed some tenderness with palpation

over the ankle, but without any real swelling.  (*Id.*)  An X-ray showed no apparent fracture.  (*Id.*)

Dr. Beretta discontinued use of Ibuprofen, and prescribed Celebrex and Flexeril.  (*Id.*)

On September 30, 2003, Plaintiff presented to John Geiser, M.D., for an orthopedic consult

ordered by Dr. Beretta.  (Tr. 311.)  After reviewing Plaintiff's medical history, Dr. Geiser told

plaintiff that it would be very unusual for his back pain to be related to the car accident if it did not

begin for at least six months following the injury.  (*Id.*)  Upon hearing this, plaintiff became

frustrated and decided that he did not want to pursue further evaluation with Dr. Geiser.  (*Id.*)

On June 2, 2004, Plaintiff saw Kurt Schwieters, M.D., for a back injury sustained on May

25, 2004. (Tr. 313.) On examination, Dr. Schwieters found slight tenderness near the right buttocks,

but noted that Plaintiff had normal straight leg raise, normal reflex, and normal sensation.  (*Id.*)  X-rays of the lower back appeared normal.  (*Id.*)  Dr. Schwieters ordered physical therapy and two Aleve tablets twice a day, and limited Plaintiff to light duty with no repeat bending or twisting.  (Tr. 314.)  Plaintiff presented for physical therapy on June 4, 2004, but reported no real benefit.  (Tr. 299, 314.)  On June 23, 2004, Dr. Schweiters again limited Plaintiff to light duty, and ordered a new MRI, which was taken on July 20, 2004.  (Tr. 314-317, 321-22.)  The MRI showed no focal disk protrusion or extrusion, a minimal broad-based disk bulging at L5-S1, and no evidence of impingement.  (*Id.*)

### C.  Medical Evidence - Mental Impairments

In January 2001, Plaintiff presented to Judith Nelson, M.S., R.N.C.S., for a follow-up appointment for depression.  (Tr. 160.)  He had missed two appointments which were scheduled for December in order to do a recommended assessment for testing.  (*Id.*)  Ms. Nelson noted that Plaintiff was still having difficulty with motivation, energy, and was refusing to do the testing.  (*Id.*)  Her impression was depression, not otherwise specified ("NOS"), and polysubstance abuse of cannabis and alcohol.  (*Id.*)  She recommended that he continue taking Zoloft, and do some further testing.  (Tr. 161.)  She knew that Plaintiff was looking for SSI and disability, but was "not clear he [had] all the symptoms to support that."  (*Id.*)

On November 20, 2002, Plaintiff was referred to, and presented to, Tim Tinius, Ph.D., for a psychological evaluation. (Tr. 202.)  He indicated that he was taking Paxil and Trazadone at the time, and had previously tried Zoloft.  (*Id.*)  He also stated that he had difficulty learning and reading, and did not read newspapers.  (*Id.*)  He had served time in jail two or three times, including an eight-month term for third-degree criminal assault for a sexual relationship with a minor.  (*Id.*)

9

He had trouble controlling his anger, had poor patience, and was easily frustrated and fatigued. (*Id.*) Plaintiff also reported feeling depressed and suicidal in the past. (*Id.*) Dr. Tinius described him as having slowed thinking, poor organization, trouble focusing, problems with memory, and difficulty sleeping. (*Id.*) Dr. Tinius also noted a 1994 evaluation which scored his overall IQ at 72, verbal IQ at 73, and nonverbal IQ at 74  At the time, Dr. Tinius diagnosed Plaintiff with learning disability, NOS, rule out attention deficit hyperactivity disorder ("ADHD"), post traumatic stress disorder ("PTSD") and major depressive disorder. (Tr. 203.)

On January 17, 2003, Dr. Tinius performed a neuropsychological evaluation (Tr. 197.) Plaintiff's WAIS-III IQ scored at 77 full scale, 82 verbal, and 76 nonverbal. (*Id.*) His reading level determined to be at an 8th grade level, his spelling at a 6th grade level, and his calculation of written math problems at a 5th grade level. (*Id.*) Plaintiff's full-scale and visual attention were severely impaired, but his auditory attention was in the low end of the average range. (*Id.*) He diagnosed the Plaintiff with a learning disability NOS, ADHD, major depressive disorder, PTSD, and rule out dependent personality disorder. (*Id.*) Dr. Tinius then recommended that Plaintiff attend individual psychotherapy and counseling, (*Id.*), and that he apply for Social Security Disability. (Tr. 202.)

On February 25, 2003, Plaintiff filled out an Activities of Daily Living Questionnaire. (Tr. 102.) He indicated that his condition was due to Fetal Alcohol Syndrome, and he has struggled with his condition his entire life. (*Id.*)

On September 8, 2003, R. Owen Nelson, Ph.D., a state agency medical consultant, completed a mental capacity assessment of Plaintiff's abilities. (Tr. 245.) Dr. Nelson opined that Plaintiff did not meet any Listings. (Tr. 245-62.) He further reported that Plaintiff could understand and remember simple, routine, repetitive, 1-2-3-step instructions, and that he could carry out those

instructions under ordinary levels of supervision within reasonable limits of pace and persistence. (Tr. 247.)  He could relate to coworkers and the general public on a brief and superficial basis, but could only manage routine changes in the customary unskilled work setting.  (*Id.*)

Case notes from Processus, P.A., dated July 14, 2004, indicate that Plaintiff felt suicidal.  (Tr. 290.)  The following day, Plaintiff presented for depression, and was diagnosed as having depression with anxiety features; he was prescribed Lexapro.  (Tr. 318.)

### D.  Plaintiff's Testimony

On July 26, 2004, Plaintiff gave testimony pertaining to his impairments before the ALJ. (Tr. 357-377.)  At the time, he reported being employed part-time for the night-shift at Jenny-O Turkey. (Tr. 356.)  His responsibilities included cleaning machines with a water hose and scrubber for approximately 20 hours a week.  (*Id.*)  He stated that the job was going "okay," but noted some problems bending and lifting equipment due to the bulging disk in his back.  (Tr. 357, 370.)  He further stated that a mixture of physical pain and what he was feeling mentally had caused him to miss work two or three times since he started working in May.  (Tr. 373-74.)

Plaintiff also testified as to his previous work experience at the golf course and Arlington Place.  (Tr. 368-69, 376-77.)  Employment at both places lasted in the realm of months before Plaintiff was fired.  (*Id.*)  At the golf course, Plaintiff had problems "remembering" tasks, such as what areas to mow.  (Tr. 369.)  At Arlington place, Plaintiff was fired for making medication errors. (Tr. 376-77.)

Beside the bulging disk in his back, Plaintiff also complained of pain in the right knee and foot.  (Tr. 359-63.)  According to Plaintiff, he experienced tenderness and sharp, shooting pains in the knee when he walked down stairs; walking on flat level ground caused no pain.  (Tr. 359-60.)

The foot pain was due to the ankle injury suffered due to his car accident. (Tr. 361-65.) This sharp pain and soreness was located around the inside "knob" of the right ankle, and associated with weight-bearing activities such as walking. (*Id.*) The severity of pain varied directly with level of activity. (Tr. 362-63.) Generally, staying off his feet for a day caused the pain to go away. (*Id.*) However, the nine hours per day he generally spent on his feet was causing him to have pain every day. (Tr. 363.) Plaintiff was taking Ibuprofen, but believed it was not helping. (*Id.*) Plaintiff testified that there were no other injuries resulting from the accident besides the ankle (Tr. 365), but mentioned previous unrelated pain in the right shoulder which was treated with a cortisone shot. (Tr. 363-64.)

Plaintiff testified that he attended high school through the tenth grade, which included special education for several classes. (Tr. 358.) He maintained a driver's license, and could read traffic signs, newspapers, and restaurant menus. (Tr. 357-359.) He also stated, however, that he rarely read newspapers, books, or magazines. (Tr. 372.) He helped around the house with tasks such as washing clothes, but did not help with grocery shopping and had difficulty making change. (Tr. 371-73.) He spent time with his kids, and helped his bedridden sister by bringing her food and helping her do leg exercises. (Tr. 372.) He did not belong to any clubs, organizations, or support groups (Tr. 372), but the record indicates that he participated in sex offender group meetings. (Tr. 87.) Plaintiff also claimed he had no friends outside of family, but didn't have a problem getting along with people. (Tr. 373-74.) Rather, he had a hard time saying no to people, which often resulted in his being taken advantage of. (Tr. 374.)

Plaintiff confirmed symptoms of depression, and indicated that he was on Lexapro at the time, and Paxil and Zoloft previously. (Tr. 365.) He also testified as to an earlier hospitalization

for a suicidal stage due to relationship issues, and problems sleeping since his house burned down. (Tr. 366-67.)

### E.  Third Party Witness Testimony

Three witnesses testified on Plaintiff's behalf: Scott Mattson, a former employer, Renae Peters, Plaintiff's fiancé, and Jo Mattson, Renae's mother and Mr. Mattson's wife.  (Tr. 349, 377-394.)  Scott Mattson testified that Plaintiff had worked for him at a golf course for a period of approximately three months. (Tr. 378.)  Plaintiff's tasks consisted of manual labor including picking and breaking rocks, operating machinery, moving dirt, mowing, and setting up irrigation lines.  (Tr. 378-80.)  Plaintiff worked from August 1998, to October 1998, and was then fired due to attendance and an inability to complete the assigned tasks. (Tr. 378.)  Regarding the former reason, Mr. Mattson stated, "He wouldn't show up to work on a regular basis. . . . I'm not sure [why].  It just  seemed like something else always came up."  (Tr. 378-79.)   Mr. Mattson described the latter reason as "not being able to do the job itself."  (*Id.*)  These tasks usually changed regularly by the day or by the hour.  (Tr. 380.)  He eventually had Plaintiff write down instructions in a notebook, but this was ineffective. (Tr. 379.)  He believed that Plaintiff simply forgot to reference the notebook.  (*Id.*)  Mr. Mattson also testified that he provided Plaintiff a greater than normal amount of supervision, checking in on an hour-by-hour basis.  (*Id.*)

Ms. Mattson testified on Plaintiff's daily activities, which she had observed during the eight or nine year period that she had known him.  (Tr. 381-87.)  She described Plaintiff's difficulties with household tasks such as grocery shopping, cooking, and doing laundry.  (*Id.*)  She was unable to give Plaintiff more than one or two directions (Tr. 384), and more tasks were left unaccomplished when

he was asked to complete more than one at a time.  (Tr. 386.)  Plaintiff also tended to show frustration when he couldn't help his children with their homework.  (Tr. 383.)

Ms. Peters testified that she had been in a relationship with Plaintiff for over eight years.  (Tr. 387.)  She and Plaintiff had three children together, and two additional children of her own.  (Tr. 387-88.) She attempts to give him responsibility taking care of the children and the house, but finds that he has difficulty staying focused.  (Tr. 388.)  He helps but has trouble with tasks such as cleaning the house, doing dishes, grocery shopping, and making change. (Tr. 388-94.) When asked by the ALJ whether Plaintiff could do a job that was simple and repetitive, she responded that he could until he got frustrated.  (Tr. 389.)

### F.  Medical Expert's Testimony

James Felling, Ph.D., testified at the hearing as the neutral medical expert ("ME").  His testimony was based in large part on the neuropsychological evaluation done by Dr. Tinius.  (Tr. 395.)  According to Dr. Felling, the primary and most well documented impairment was that of borderline intelligence.  (Tr. 395-96.)  Dr. Felling did not find the diagnosis of a learning disorder to be well documented.  (Tr. 395.) While the reading, math, and spelling levels were lower than expected for his IQ, they were not much lower.  (*Id.*)

Similarly, Dr. Felling agreed that Plaintiff had some problems with distractibility and short attention span, but would not go as far as to label them as ADHD.  (Tr. 395-96.)  In his opinion, it was not "real clear as far as where that diagnosis came from."  (Tr. 395.)  Dr. Felling further stated, "[I]t's hard to discern whether [his attention problems] are specifically an attention deficit disorder or whether that's part and parcel of the low cognitive abilities.  I think it's a little of both." (Tr. 399.)

As for the diagnosis of PTSD, Dr. Felling found that no particular symptoms were

documented. (Tr. 396.) Plaintiff was also diagnosed with depression NOS. (*Id.*) But this diagnosis was based largely on test reports of questionable validity due to Plaintiff's reading difficulties, attention difficulties, and his tendency to "make a cry for help," listing a very high number of symptoms and problems. (*Id.*)

Dr. Felling next evaluated the severity of Plaintiff's impairments. (Tr. 396-98.) In terms of activities of daily living, Dr. Felling found that Plaintiff's restrictions were mild to moderate, with a marked restriction in functioning independently. (Tr. 396.) He also testified that Plaintiff had a moderate restriction as to social functioning, and a marked restriction as to concentration, persistence, and pace. (*Id.*) Dr. Felling found no episodes of decompensation. (Tr. 398.)

Dr. Felling believed that Plaintiff met the requirements of the Listing of Impairments. (Tr. 398.) While initially undecided about whether listing 12.02 or 12.05 applied, he later determined 12.05 to be the most appropriate listing. (*Id.*) When asked by the ALJ whether Plaintiff had manifested adaptive functioning before age 22, Dr. Felling found "not much other than . . . the special education programming." (Tr. 399.) Testing did not reveal any history prior to age 22 regarding adaptive functioning. (*Id.*) Mr. Rethmeier proposed the possibility of equaling the listing by rationale that equaling a listing meant a condition of severity equal to a listed impairment. (Tr. 401.) Dr. Felling responded that if he didn't qualify Plaintiff as "meeting," then "equaling" would be the next step. (*Id.*)

The ALJ also questioned Dr. Felling on any limitations to be imposed in a work setting. (Tr. 400.) Dr. Felling stated that he would restrict Plaintiff to "extremely simple repetitive tasks, with very few, if any, changes in functioning, either in terms of an hour-by-hour or day-to-day or week-to-week basis. It would have to be the same kind of task." (*Id.*) He would further limit

15

Plaintiff to low stress with respect to pace and persistence, and to tasks that require no substantial ability to read or to do mathematical computations.  (*Id.*)

### G. Vocational Expert's Testimony

Wayne Onken testified at the hearing as the vocational expert ("VE").  The ALJ proposed the following hypothetical to the VE:

> [A]ssume . . . we're discussing a male person who apparently finished the last grade being the 10th grade, there with special education, of the age range of 32 to approximately 36 years, with past work as set out in your report at 13E who does have impairments. . . . From these impairments . . . [h]e is likely limited to a light range, though would need a sit/stand option.  Not on his feet for more than 30 minutes per position per time.  That is basically not on his feet for more than 30 minutes per time before being able to change his position for a few minutes. Shouldn't be using stairs as a part of the job task, and also limited to those additional non-exertional restrictions the doctor gave.  That is simple, repetitive tasks with few or no changes in the type of task, with low stress, no high production kind of jobs. He shouldn't have reading and math as a substantial part of his job task.

(Tr. 403-04.)  The VE testified that someone falling within the hypothetical would not be able to do any of the past jobs listed on his report.  (Tr. 404.)  However, he offered other jobs that would fit the hypothetical.  (*Id.*)  Among them were assembler of small products, hand packager, and production assembler, each with approximately 1,000 jobs.  (*Id.*)

The ALJ added a restriction that jobs be simple, having routine, repetitive, concrete, and tangible tasks. (Tr. 405.) This restriction did not change the VE's testimony.  (*Id.*)  The ALJ further restricted the hypothetical to a sedentary level because of time on feet.  (*Id.*)  According to the VE, about half of the hand packaging jobs would be at sedentary level.  (Tr. 404-05.)  There would also be other assembly jobs such as final assembler, with about 1,000 positions.  (Tr. 405.)

Mr. Rethmeier, Plaintiff's attorney, then proposed other limitations.  (Tr. 405.)  First, he asked whether a person who required a closer level of supervision, such as being checked in on

every half hour, would be in the sheltered workshop area of employment.  (Tr. 405-06.)  Second, he asked whether a person who would miss work more than two unscheduled times per month due to exacerbation of symptoms resulting from his psychological conditions would fall outside of competitive employment.  (Tr. 406.)  The VE opined that either restriction would place the person outside of competitive employment.  (*Id.*)

### H.  The ALJ's Decision

In determining whether Plaintiff was disabled, the ALJ followed the five-step process outlined in 20 C. F. R. § 404.1520 and 20 C. F. R. § 416.920.  (Tr. 19.)  First, the ALJ determined that there was insufficient evidence of disqualifying substantial gainful activity, and thus the claim could not be denied due to work activity.  (*Id.*)  Second, the ALJ evaluated whether Plaintiff was subject to any severe medically determinable impairments - those which "significantly limit an individual's physical or mental ability to do basic work activities."  (*Id.*)  The ALJ found that:

> [M]edical evidence indicated that Plaintiff  had status post right ankle fracture, healed; mild degeneration of lateral talar dome; very mild tendinopathy; fourth metatarsal joint 2 millimeter cyst; borderline intellectual functioning; learning disorder NOS; attention deficit hyperactivity disorder; post traumatic stress disorder; and major depressive disorder, impairments that are "severe" within the meaning of the Regulations.

(Tr. 20.)  While the ALJ found the borderline intellectual functioning to be the only mental impairment that was well supported by the record, he added the remaining impairments to the list of severe impairments, giving Plaintiff "the benefit of every reasonable doubt."  (Tr. 27.)

Third, the ALJ determined that although Plaintiff's impairments were severe, they were not "severe" enough to meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  (*Id.*)  The ALJ noted that Dr. Felling, the ME, testified that the borderline intellectual functioning was the only condition supported by the record;

the other conditions were not well documented. (*Id.*) However, Dr. Felling also opined that Plaintiff had an impairment that met the severity of listing 12.02 or 12.05. (*Id.*) He further stated that with Plaintiff's lack of initiative and good judgment, the combination of impairments equaled the severity of the same listings. (*Id.*)

Given the existing record, the ALJ did not place significant weight on Dr. Felling's opinion that Plaintiff met or equaled listing 12.02 or 12.05. (Tr. 20-21.) He noted that Plaintiff's test scores placed him in the borderline intelligence range, rather than the mentally retarded range. (Tr. 20.) Furthermore, he noted that Plaintiff had not been involved in regular mental health treatment and was largely untreated at the time of Dr. Tinius' evaluation. (*Id.*) Nor did Plaintiff follow through with the recommended therapy or counseling. (*Id.*) The ALJ also observed that Plaintiff was involved in a long-term relationship, had three children with his significant other, spent his days at home caring for his children, maintained a driver's licence and did in fact drive, and helped care for a physically impaired sister. (*Id.*)

Next, the ALJ determined whether Plaintiff retained the residual functional capacity ("RFC") to perform the requirements of his past relevant work or other work existing in significant numbers in the national economy. In doing so, the ALJ considered Plaintiff's testimony that he had a long history of physical pain and mental impairments. (Tr. 21.) However, the ALJ discounted the Plaintiff's testimony due to conflicts with his actual functional capabilities, the medical evidence, and the overall evidence of record. (*Id.*) He examined Plaintiff's medical record in detail, and determined that it was not fully consistent with Plaintiff's allegations, but was generally consistent with the following RFC: "lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking 6 hours of an 8 hour day; sitting 6 hours of an 8 hour day; stand/sit option

every 30 minutes; no use of stairs; simple, routine, repetitive, and concrete tasks; low stress as to

persistence and pace; and little reading and math." (Tr. 27.)

Lastly, relying on the Plaintiff's RFC and the VE's testimony, the ALJ determined that

Plaintiff could not perform past relevant work. (Tr. 28.) He therefore asked the VE whether a

hypothetical individual with similar limitations as the Plaintiff could perform any other work that

existed in significant numbers. (*Id.*) Based on the VE's testimony that the hypothetical person could

in fact perform work that existed in significant numbers, the ALJ found Plaintiff not to be under a

"disability" as defined in the Social Security Act. (Tr. 28-29.)

### III. STANDARD OF REVIEW

In reviewing a final decision of the Commissioner, this Court is limited to a determination

of whether that decision is supported by substantial evidence on the record as a whole. *See*

*Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999); *Black v. Apfel*, 143 F.3d 383, 385 (8th

Cir. 1998). Substantial evidence means "more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229

(1938)); *see also Ghant v. Bowen*, 930 F.2d 633, 637 (8th Cir. 1991). Review of the ALJ's factual

determinations is deferential, and the Court will neither re-weigh the evidence nor review the factual

record de novo. *See Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997). In determining whether

evidence is substantial, the Court must consider and weigh the evidence supporting and detracting

from the determination of the Commissioner. *See Black*, 143 F.3d at 385; *Ghant,* 930 F.2d at 637.


The Court, however, "may not reverse merely because substantial evidence would have

supported an opposite decision." *Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000) (internal

citations omitted).    In the event that a review of the record as a whole could support two

inconsistent reasonable findings, the Court must affirm the Commissioner's decision. *See Shelton*

*v. Chater*, 87 F.3d 992, 995 (8th Cir. 1996).   The decision may not be reversed simply because

substantial evidence might also support the a contrary outcome. *See Prosch v. Apfel*, 201 F.3d 1010,

1012 (8th Cir. 2000).

## IV.  CONCLUSIONS OF LAW

### A.  The ALJ Properly Evaluated the Medical Evidence of Record, and Gave Appropriate Weight to the Opinions of Plaintiff's Treating  Physician and the ME.

Plaintiff argues that the ALJ erred by failing to place significant weight on the opinion Dr.

Tim Tinius.  (Pl.'s Mem. 14.)  Generally, treating physicians are given more weight.  20 C. F. R. §

404.1527(d)(2).  Their opinions, however, do not automatically control, since the record must be

evaluated as a whole.   *Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir. 1996).   Rather, their

opinions are only given controlling weight if the opinions are well supported by medically

acceptable clinical and laboratory diagnostic techniques and are not inconsistent with other

substantial evidence in the record.  20 C. F. R. § 404.1527(d)(2).  When finding that a treating

source's opinion is not entitled to controlling weight, the following factors are considered: (1) length

of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment

relationship; (3) whether relevant evidence supports the opinion; (4) whether the opinion is

consistent with the record as a whole; (5) whether the source is a specialist; and (6) any other

factors. 20 C. F. R. § 404.1527(d).   The ALJ did not place controlling weight on Dr. Tinius'

opinion due to the lack of evidence suggesting a finding of disability. (Tr. 27.)  The record only

shows two visits to Dr. Tinius by Plaintiff: first an intake to gather background information, and second a neuropsychological evaluation. (Tr. 197-203.) The ALJ found that the record showed that Plaintiff was not involved in regular mental health treatment and was largely untreated at the time of Dr. Tinius' evaluation. (Tr. 20.) Plaintiff also never followed up on Dr. Tinius' recommendations for therapy and counseling. (*Id.*) As Dr. Felling pointed out, all of Dr. Tinius' diagnosis, with exception to that of borderline intelligence, were not well documented or supported by the record. (*Id.*) Dr. Tinius' opinion was also inconsistent with the record as a whole. Ms. Judith Nelson, had previously noted that it was "not clear that [Plaintiff] had all the symptoms to support [SSI and Disability]." (Tr. 23.) The ALJ also considered Plaintiff's daily activities. (Tr. 20, 26-27.) The ALJ thus placed appropriate weight on the opinion of Dr. Tinius. The Court also takes notice that despite the lack of evidence in the record suggesting mental disability, the ALJ still gave the Plaintiff "the benefit of every reasonable doubt," and added the impairments to the list of severe impairments. (Tr. 27.)

Plaintiff also argues that the ALJ failed to place significant weight on the opinion of the neutral ME, Dr. Felling. (Pl.'s Mem. 14.) The ALJ agreed with many of Dr. Felling's findings, but decided not to place significant weight on the opinion that Plaintiff met or equaled listing 12.02 or 12.05, as such a finding was not supported by the record evidence. (Tr. 20.) The ALJ also found that Dr. Felling's testimony regarding 12.02(B) and 12.05(D) criteria was significantly influenced by Plaintiff's testimony and the results of Dr. Tinius's testing. (*Id.*) 20 C. F. R. § 404.1527(e) reserves opinion on some issues, that are not medical issues, for the Commissioner. 20 C. F. R. § 404.1527(e). For example, the Commissioner is responsible for making the determination about whether a claimant is disabled. 20 C. F. R. § 404.1527(e)(1). A statement by a medical source that

a claimant is disabled does not guarantee that the Commissioner will find disability.  *Id.*

Listing 12.02 states in relevant part:

12.02 Organic Mental Disorders: Psychological or behavioral abnormalities associated with a dysfunction of the brain.  History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.

1. The Required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Demonstration of a loss of specific cognitive abilities . . . .

C. Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1.  Repeated episodes of decompensation . . . or 2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C. F. R. Part 404, Subpart P, Appendix 1, § 12.02. Plaintiff does not meet this listing, as he has demonstrated no loss of cognitive ability.  In fact, his activities of daily living questionnaire provided as follows: "Q: Please describe your condition <u>after</u> your impairment began.  A: . . . I have been struggling all my life even during my school years. . . .  Q: Describe what you were like <u>before</u> your impairment began.  A: I have been this way all my life."  (Tr. 102) (emphasis in original).

Similarly, listing 12.05 states in relevant part:

12.05 Mental retardation: . . . .

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the

use of standardized measures of intellectual functioning is precluded;

B. A valid verbal, performance, or full scale IQ of 59 or less;

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: . . . .

20 C. F. R. Part 404, Subpart P, Appendix 1, § 12.05.  Plaintiff's IQ scores as determined by a 1994 test showed an overall IQ score of 72, a verbal IQ score of 73, and a nonverbal IQ score of 74.  (Tr. 202-03.)  Dr. Tinius' evaluation yielded the following scores: a full-scale IQ of 77, a verbal IQ of 82, and a nonverbal IQ of 76.  (Tr. 197.)  None of these scores fall within the criteria of listing 12.05. Thus the ALJ did not err by not placing significant weight on Dr. Felling's opinion that Plaintiff met or equaled the listings.

## B.  The ALJ Gave Proper Consideration to Plaintiff's Subjective Claims of Impairment.

Plaintiff argues that the ALJ erred by failing to afford credibility to Plaintiff's subjective complaints of pain and failed to recognize Plaintiff's significant non-exertional limitations.  (Pl.'s Mem. 16-17.)  The ALJ may not disregard a claimant's subjective complaints solely because the objective evidence does not fully support them.  *Polaski v Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984).  Rather, he may only discount those complaints if there are inconsistencies in the evidence as a whole.  *Id.*  In making a determination of credibility with regards to claimant's subjective complaints, the ALJ  is required to give full consideration to all of the evidence presented including work record and observations by third parties and treating physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating

and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) function restrictions. *Id.* On appeal, the Court must consider both whether the ALJ considered all evidence relevant to claimant's subjective complaints, and whether the evidence contradicted Plaintiff's own account. *Benskin v Bowen*, 830 F.2d 878, 882 (8th Cir. 1987).

In his decision, the ALJ considered each of the factors mentioned above. First, he noted Plaintiff's work record, specifically that he had held multiple jobs following his alleged date of onset. (Tr. 19.) He considered Plaintiff's daily activities, such as maintaining a long-term relationship, caring for five children, maintaining a driver's license and driving, helping with laundry and cooking, and caring for his disabled sister. (Tr. 26-27.) He considered allegations pertaining to the duration, frequency, and intensity of pain, and precipitating and aggravating factors such as use of stairs or prolonged standing. (Tr. 22, 27, 359-364.) Also, he examined functional limitations, and took particular notice of the effect of medication. (Tr. 22, 27, 363-64.) For example, Plaintiff treated most physical pain solely with ibuprofen, and the pain in his shoulder was treated with a single cortisone shot. (*Id.*)

Having considered all relevant evidence, the ALJ determined the evidence as a whole contradicted Plaintiff's subjective complaints of pain. (Tr. 21, 27.) Plaintiff's medical record consisted of an extensive history of medical testing that usually showed normal function, or at most minimal to moderate tenderness. (Tr. 21-27.) With this history, Plaintiff's documented tenancy to "make a cry for help" by listing a very high number of symptoms and problems (Tr. 396), and analysis of the factors listed above, the Court finds that the ALJ did not err by discounting the Plaintiff's subjective allegations of impairment.

**C.  The ALJ Offered the VE a Valid and Complete Hypothetical that was Supported by Substantial Evidence of Record.**

Plaintiff contends that the ALJ erred by failing to offer the VE a valid and complete hypothetical, the answer to which would serve as a basis for finding of vocational incapacity. (Pl.'s Mem. 19.)  He argues that the hypothetical posed by the ALJ was flawed by improper discounting of the treating physician's medical evidence of record and by the flawed *Polaski* analysis.  (*Id.*)  It is his opinion that his testimony, along with that of his corroborating witnesses, and the medical evidence of record, supports the adoption of the two additional restrictions posed by Mr. Rethmeier. (*Id.*)  Either of these restrictions would place the Plaintiff at a less than competitive level.  (Tr. 405-06.)  However, Plaintiff has failed to bring to this Court's attention any evidence that supports his assertion.  The ALJ was not required to include these limitations, as they were not supported by substantial evidence in the record.  *See Pearsall v. Massanari*, 274 F.3d 1211, 1220 (8th Cir. 2001) *and Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001).

The first restriction Mr. Rethmeier proposed was that of a closer than normal level of supervision, for the purpose of keeping the worker on task, with attention from a supervisor every one-half hour.  (Pl.'s Mem. 19, Tr. 405-06.)  There is no evidence of record that shows that this restriction is warranted.  Mr. Mattson testified that he checked in on Plaintiff "pretty much" hourly, but this was for a job where tasks could change by the hour.  (Tr. 380.)  The ALJ's hypothetical was already limited to simple, repetitive tasks with few or no changes in the type of task. (Tr. 303-04.) Ms. Peters, Plaintiff's fiancé and girlfriend of over eight years, testified that she believed Plaintiff could do such a job until he got frustrated.  (Tr. 387-89.)  But the ALJ had also limited the hypothetical to jobs with low stress and involving little reading or math.

The second restriction Mr. Rethmeier proposed was where exacerbation of psychological symptoms caused the person to be absent from work more than two times, unscheduled, per month.

(Pl.'s Mem. 19, Tr. 406.)  However, it is unclear from the evidence of record that Plaintiff missed work due to exacerbation of psychological symptoms.  Mr. Mattson testified that he was not sure why Plaintiff failed to show up on a regular basis.  (Tr. 378-79.)  Plaintiff himself testified that he "think[s] it's a mixture of both [physical pain and the way he is feeling mentally]."  (Tr. 373-74.) Furthermore, there is also no evidence to support Plaintiff's assertion that he would miss work for more than two times, unscheduled, per month.  Plaintiff testified that he had missed work two or three times since he started at Jenny-O in May 2004.  (Tr. 374.)  A hearing date of July 26, 2004 (Tr. 349), and an employment commencement date prior to May 25 (his date of injury) (Tr. 316-17), yield a span of at least two months.

On the other hand, an evaluation by Dr. Owen Nelson indicated that Plaintiff could understand and remember simple, routine, repetitive 1-2-3-step instructions, and that he could carry out such instructions under ordinary levels of supervision within reasonable limits of pace and persistence.  (Tr. 247.)  Again, the evidence points away from Plaintiff's proposed restriction.  This Court therefore finds that the ALJ's hypothetical was valid, complete, and supported by evidence of record.

## V.  RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment [#14] be **DENIED**;

2. Defendant's Motion for Summary Judgment [#18] be **GRANTED**; and

3. The Commissioner's decision be **AFFIRMED**.

DATED: December 3, 2007

s/ *Franklin L. Noel*
FRANKLIN L. NOEL

26

United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **December 20, 2007**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.